# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

| | |
|---|---|
| JOSEPH CROGNALE<br>117 Rosemary Road<br>Dedham, Massachusetts 02026,<br><br>Derivatively on Behalf of MEDICAL<br>PROPERTIES TRUST, INC.,<br><br>        Plaintiff,<br><br>    v.<br><br>EDWARD K. ALDAG, JR.<br>11 East Chase Street, Suite 9E<br>Baltimore, Maryland 21202,<br><br>R. STEVEN HAMNER<br>11 East Chase Street, Suite 9E<br>Baltimore, Maryland 21202,<br><br>EMMET E. MCLEAN<br>11 East Chase Street, Suite 9E<br>Baltimore, Maryland 21202,<br><br>J. KEVIN HANNA<br>11 East Chase Street, Suite 9E<br>Baltimore, Maryland 21202,<br><br>MICHAEL G. STEWART<br>11 East Chase Street, Suite 9E<br>Baltimore, Maryland 21202,<br><br>G. STEVEN DAWSON<br>11 East Chase Street, Suite 9E<br>Baltimore, Maryland 21202,<br><br>D. PAUL SPARKS, JR.<br>11 East Chase Street, Suite 9E<br>Baltimore, Maryland 21202,<br><br>C. REYNOLDS THOMPSON, III<br>11 East Chase Street, Suite 9E<br>Baltimore, Maryland 21202,<br><br>ELIZABETH N. PITMAN<br>11 East Chase Street, Suite 9E<br>Baltimore, Maryland 21202,<br><br>*continued on following page* | Case No.<br><br>VERIFIED SHAREHOLDER<br>DERIVATIVE COMPLAINT FOR<br>BREACH OF FIDUCIARY DUTY AND<br>UNJUST ENRICHMENT<br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>DEMAND FOR JURY TRIAL |

CATERINA A. MOZINGO
11 East Chase Street, Suite 9E
Baltimore, Maryland 21202,

    and

EMILY W. MURPHY
11 East Chase Street, Suite 9E
Baltimore, Maryland 21202,

                  Defendants,

     -and-

MEDICAL PROPERTIES TRUST, INC.,
a Maryland Corporation
11 East Chase Street, Suite 9E
Baltimore, Maryland 21202

    Serve:
      The Corporation Trust Inc.
      2405 York Road, Suite 201
      Lutherville Timonium, MD 21093,

                Nominal Defendant.

Plaintiff, by his attorneys, submits this Verified Shareholder Derivative Complaint for Breach of Fiduciary Duty and Unjust Enrichment. Plaintiff alleges the following on information and belief, except as to the allegations specifically pertaining to plaintiff which are based on personal knowledge. This complaint is also based on the investigation of plaintiff's counsel, which included, among other things, a review of public filings with the U.S. Securities and Exchange Commission ("SEC") and a review of news reports, press releases, and other publicly available sources.

<u>**NATURE AND SUMMARY OF THE ACTION**</u>

1.      This is a shareholder derivative action brought by plaintiff on behalf of nominal defendant Medical Properties Trust, Inc. ("Medical Properties" or the "Company") against certain of its officers and directors for breach of fiduciary duty, unjust enrichment, and violations of law. These wrongs resulted in significant damages to Medical Properties' reputation, goodwill, and standing in the business community, as well as exposing the Company to potential liability for violations of state and federal law.

2.      Medical Properties leases properties to healthcare companies. The Company is organized as a real estate investment trust ("REIT"). The Company primarily operates through its subsidiary, MPT Operating Partnership, L.P. ("MPT"), a Delaware limited partnership.

3.      On July 15, 2019, Medical Properties announced that it entered into an agreement to acquire fourteen acute care hospitals and two behavioral health facilities owned and operated by Prospect Medical Holdings, Inc. ("Prospect") for a purchase price of $1.55 billion. After the purchase, Medical Properties would own the properties in the Prospect portfolio and lease them back to Prospect. Among the properties in the Prospect portfolio were four hospitals located in Pennsylvania: Crozer-Chester Medical Center in Upland, Pennsylvania; Springfield Hospital in

Springfield, Pennsylvania; Taylor Hospital in Ridley Park, Pennsylvania; and Delaware County Memorial Hospital in Drexel Hill, Pennsylvania (collectively, the "Pennsylvania Properties"). Prospect, along with Steward Health Care System LLC ("Steward"), are among the Company's most important tenants.

4.      The Individual Defendants (as defined herein) misled investors into believing that the Company's assets were healthy and occupied by rent-paying tenants, including Prospect and Steward.  However, many of the Company's tenants are in a financially distressed state and are unlikely to make rent payments.  The Individual Defendants hid the truth about these tenants by issuing materially false and misleading statements and omissions.

5.      On January 26, 2023, Viceroy Research Group ("Viceroy"), an investigative financial-analyst research firm, published an in-depth report detailing the true state of the Company's health (the "Viceroy Report").  The Viceroy Report accused the Company and its fiduciaries of leasing its properties to financially distressed tenants.

6.      While the investing public was digesting the information in the Viceroy Report, Medical Properties issued a press release on February 23, 2023, announcing its financial results for the fourth quarter and fiscal year ended December 31, 2022.  The press release stated that the Company was recording a $283 million impairment charge consisting of a $171 million write-down of assets related to the Pennsylvania Properties and a $112 million write-off of unbilled rent owed by Prospect.  The press release, and accompanying results, largely supported Viceroy's key claims about Medical Properties' tenants.

7.      Also on February 23, 2023, the Company announced that defendant Emmet E. McLean ("McLean"), Medical Properties' Executive Vice President, Chief Operating Officer

("COO") and Secretary, was resigning, effective September 1, 2023.  Defendant McLean had served Medical Properties for more than twenty years.

8.      In the wake of the disclosure, Medical Properties' stock plunged for several days by more than 17.46%, or $2.13 per share, until March 1, 2023, to close at $10.07 per share compared to the February 22, 2023 close of $12.20 per share, erasing $1.27 billion in market capitalization.

9.      On May 10, 2023, Medical Properties confirmed Steward's poor financial condition.  That day, the Company filed its Quarterly Report for the first quarter ended March 31, 2021, which disclosed that Steward sold five operations to garner cash and pay Medical Properties $150 million in proceeds for outstanding loans.  The facilities were severed from a master lease with Steward and the Company was required to write off approximately $94 million of straight-line rent receivables.

10.     As investors digested this information, Medical Properties' stock plunged by more than 9% over just two trading days, or $0.79 per share on May 12, 2023, to close at $7.64 per share, erasing $472.6 million in market capitalization.

11.     On January 4, 2024, Medical Properties further established the financially distressed state of Steward.  That day, the Company issued a press release announcing that it plans to accelerate its efforts to recover uncollected rents and outstanding loan obligations from Steward.  Steward informed Medical Properties that Steward's liquidity was negatively impacted by significant changes to vendors' payment terms.  As a result, Steward continued to make partial monthly rent payments, and total unpaid rent under its consolidated master lease with the Company is approximately $50 million as of December 31, 2023.

12.     On this news, Medical Properties' stock plunged by more than 32% over just two trading days, or $1.61 per share on January 8, 2024, to close at $3.39 per share, erasing $964.3 million in market capitalization.

13.     Though Medical Properties' outside shareholders were decimated by this scheme, the Insider Selling Defendants (as defined herein) were not similarly damaged.  These defendants sold stock while in possession of material nonpublic information concerning the Company's operations.  Due to their positions at the Company, the Insider Selling Defendants had insider knowledge regarding Medical Properties' transactions with its top tenants.  During the Sales Period,[1] the Insider Selling Defendants collectively reaped over $65.6 million in proceeds from the sale of their personally held Company stock.

14.     Further, as a direct result of this unlawful course of conduct, the Company is now the subject of a federal securities class action lawsuit filed in the U.S. District Court for the Northern District of Alabama on behalf of investors who purchased Medical Properties' shares (the "Securities Class Action").

15.     On June 8, 2023, plaintiff sent a litigation demand to Medical Properties' Board of Directors (the "Board") detailing the wrongdoing alleged herein and demanding that the Board investigate and then bring litigation against the culpable fiduciaries (the "Demand").  The Board took over a month to respond that it would consider the Demand "in appropriate due course." Notably, this same counsel is also representing Medical Properties in the related Securities Class Action.  On November 13, 2023, over five months after the Demand was sent, the Board informed plaintiff it was deferring its consideration of the Demand indefinitely.  It has been over a year since

---

[1] The "Sales Period" is from July 15, 2019 through January 5, 2024.

plaintiff sent the Demand and the Board has not even given a timeframe for when an investigation would begin.  Accordingly, the Board has effectively, and wrongfully, refused the Demand.

## JURISDICTION AND VENUE

16.     Jurisdiction is conferred by 28 U.S.C. §1332.  Complete diversity among the parties exists and the amount in controversy exceeds $75,000, exclusive of interest and costs.

17.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

18.     Venue is proper in this Court in accordance with 28 U.S.C. §1391 because: (i) Medical Properties is incorporated in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to Medical Properties, occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

**Plaintiff**

19.     Plaintiff Joseph Crognale was a shareholder of Medical Properties at the time of the wrongdoing complained of, has continuously been a shareholder since that time, and is a current Medical Properties shareholder.  Plaintiff is a citizen of Massachusetts.

**Nominal Defendant**

20.     Nominal defendant Medical Properties is a Maryland corporation with principal executive offices located at 1000 Urban Center Drive, Suite 501, Birmingham, Alabama. Accordingly, Medical Properties is a citizen of Maryland and Alabama.  Medical Properties was formed in 2003.  The Company's primary business strategy is to acquire and develop healthcare facilities and lease the facilities to healthcare operating companies under long-term net leases, which require the tenant to bear most costs associated with the property.  Medical Properties also makes mortgage loans to healthcare operators, collateralized by their real estate assets, and further makes loans to certain operators through the Company's taxable REIT subsidiaries.  Finally, from time to time, Medical Properties makes non-controlling investments in its tenants in conjunction with larger real estate transactions which give the Company a right to share in such tenant's profits and losses.  As of February 16, 2024, Medical Properties had 121 employees.

**Defendants**

21.     Defendant Edward K. Aldag, Jr. ("Aldag") has been Medical Properties' Chairman of the Board since March 2004, and Chief Executive Officer and a director since August 2003.  He was also Medical Properties' Secretary from August 2003 to March 2005, and Vice Chairman of the Board from August 2003 to March 2004.  Defendant Aldag co-founded Medical Properties in August 2003.  He was a member of Medical Properties' Risk Committee from at least April 2022 to at least April 2024.  Defendant Aldag is named as a defendant in the Securities Class Action complaint that alleges he violated sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").  While in possession of material, nonpublic information concerning Medical Properties' true business health, defendant Aldag sold 1,827,939 shares of his personally held

Company stock for $37,610,483.90 in proceeds. Medical Properties paid defendant Aldag the following compensation:

| Year | Salary | Bonus | Stock Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|-------|--------------|----------------------------------------|------------------------|-------|
| 2023 | $1,000,000 | $400,000 | $13,940,389 | $2,400,000 | $113,662 | $17,854,051 |
| 2022 | $1,000,000 | $600,000 | $12,380,300 | $1,900,000 | $145,213 | $16,025,513 |
| 2021 | $1,000,000 | $600,000 | $12,928,532 | $2,400,000 | $108,097 | $17,036,629 |
| 2020 | $1,000,000 | $600,000 | $12,732,033 | $2,400,000 | $125,604 | $16,857,637 |
| 2019 | $1,000,000 | $450,000 | $13,904,809 | $1,800,000 | $98,627 | $17,253,436 |

Defendant Aldag is a citizen of Alabama.

22. Defendant R. Steven Hamner ("Hamner") has been Medical Properties' Chief Financial Officer since September 2003, Executive Vice President since August 2003, and a director since February 2005. He was also Medical Properties' Chief Accounting Officer from August 2003 to September 2003. Defendant Hamner co-founded Medical Properties in August 2003. He was a member of Medical Properties' Risk Committee from at least April 2022 to at least April 2023. Defendant Hamner is named as a defendant in the related Securities Class Action complaint that alleges he violated sections 10(b) and 20(a) of the Exchange Act. While in possession of material, nonpublic information concerning Medical Properties' true business health, defendant Hamner sold 902,500 shares of his personally held Company stock for $18,575,025 in proceeds. Medical Properties paid defendant Hamner the following compensation:

| Year | Salary | Bonus | Stock Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|-------|--------------|----------------------------------------|------------------------|-------|
| 2023 | $675,000 | $202,500 | $6,970,186 | $1,215,000 | $49,931 | $9,112,617 |
| 2022 | $675,000 | $303,750 | $6,190,172 | $961,875 | $32,974 | $8,163,771 |
| 2021 | $675,000 | $303,750 | $6,464,266 | $1,215,000 | $27,313 | $8,685,329 |
| 2020 | $675,000 | $303,750 | $6,366,029 | $1,215,000 | $61,643 | $8,621,422 |
| 2019 | $600,000 | $210,000 | $6,952,405 | $840,000 | $61,247 | $8,663,652 |

Defendant Hamner is a citizen of Texas.

23.     Defendant Emmet E. McLean ("McLean") was Medical Properties' Executive Vice President and Chief Operating Officer from September 2003 to September 2023; Secretary from 2010 to September 2023; a director from September 2003 to April 2004; and Chief Financial Officer from August 2003 to September 2003.  Defendant McLean co-founded Medical Properties in August 2003.  While in possession of material, nonpublic information concerning Medical Properties' true business health, defendant McLean sold 400,000 shares of his personally held Company stock for $7,719,000 in proceeds.  Medical Properties paid defendant McLean the following compensation:

| Year | Salary | Bonus | Stock Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|-------|--------------|----------------------------------------|------------------------|-------|
| 2023 | $368,782 | $73,333 | $10,753,254 | $366,666 | $1,017,520 | $12,579,555 |
| 2022 | $550,000 | $192,500 | $2,873,541 | $563,750 | $40,690 | $4,220,481 |
| 2021 | $550,000 | $192,500 | $4,034,826 | $770,000 | $64,625 | $5,611,951 |
| 2020 | $550,000 | $192,500 | $4,738,268 | $770,000 | $65,251 | $6,316,019 |
| 2019 | $550,000 | $192,500 | $5,634,626 | $770,000 | $61,467 | $7,208,593 |

Defendant McLean is a citizen of Alabama.

24.     Defendant J. Kevin Hanna ("Hanna") has been Medical Properties' Controller since 2008, Chief Accounting Officer since January 2016, and Senior Vice President at least April 2023. He was also Medical Properties' Vice President from January 2016 to at least April 2023. Defendant Hanna is named as a defendant in the related Securities Class Action complaint that alleges he violated sections 10(b) and 20(a) of the Exchange Act.  While in possession of material, nonpublic information concerning Medical Properties' true business health, defendant Hanna sold 50,500 shares of his personally held Company stock for $1,053,910 in proceeds.  Medical Properties paid defendant Hanna the following compensation:

| Year | Salary | Bonus | Stock Awards | All Other Compensation | Total |
|------|--------|-------|--------------|------------------------|-------|
| 2023 | $500,000 | $500,000 | $2,000,283 | $37,509 | $3,037,792 |

Defendant Hanna is a citizen of Alabama.

25.     Defendant Michael G. Stewart ("Stewart") has been a Medical Properties director since August 2016.  He was also Medical Properties' Executive Vice President and Secretary from January 2005 to June 2010, and General Counsel from October 2004 to June 2010.  While in possession of material, nonpublic information concerning Medical Properties' true business health, defendant Stewart sold 26,900 shares of his personally held Company stock for $538,811 in proceeds.  Medical Properties paid defendant Stewart the following compensation:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
| --- | --- | --- | --- |
| 2023 | $165,000 | $123,163 | $288,163 |
| 2022 | $165,000 | $125,475 | $290,475 |
| 2021 | $165,000 | $128,638 | $293,638 |
| 2020 | $157,500 | $81,707 | $239,207 |
| 2019 | $135,000 | $107,798 | $242,798 |

Defendant Stewart is a citizen of Alabama.

26.     Defendant G. Steven Dawson ("Dawson") has been a Medical Properties director since April 2004.  He was the Chair and a member of Medical Properties' Audit Committee from at least April 2019 to at least April 2024.  While in possession of material, nonpublic information concerning Medical Properties' true business health, defendant Dawson sold 7,476 shares of his personally held Company stock for $135,091.32 in proceeds.  Medical Properties paid defendant Dawson the following compensation:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
| --- | --- | --- | --- |
| 2023 | $150,000 | $123,163 | $273,163 |
| 2022 | $150,000 | $125,475 | $275,475 |
| 2021 | $150,000 | $128,638 | $278,638 |
| 2020 | $145,000 | $81,707 | $226,707 |
| 2019 | $130,000 | $107,798 | $237,798 |

Defendant Dawson is a citizen of Alabama.

27.     Defendant D. Paul Sparks, Jr. ("Sparks") has been a Medical Properties director since September 2014.  He was a member of Medical Properties' Audit Committee from at least

April 2019 to at least April 2024.  Medical Properties paid defendant Sparks the following compensation:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2023 | $115,000 | $123,163 | $238,163 |
| 2022 | $130,000 | $125,475 | $255,475 |
| 2021 | $145,000 | $128,638 | $273,638 |
| 2020 | $140,000 | $81,707 | $221,707 |
| 2019 | $125,000 | $107,798 | $232,798 |

Defendant Sparks is a citizen of Alabama.

28.    Defendant C. Reynolds Thompson, III ("Thompson") has been a Medical Properties director since August 2016.  He was a member of Medical Properties' Audit Committee from at least April 2019 to at least April 2024.  Medical Properties paid defendant Thompson the following compensation:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2023 | $145,000 | $123,163 | $268,163 |
| 2022 | $145,000 | $125,475 | $270,475 |
| 2021 | $145,000 | $128,638 | $273,638 |
| 2020 | $140,000 | $81,707 | $221,707 |
| 2019 | $125,000 | $107,798 | $232,798 |

Defendant Thompson is a citizen of Alabama.

29.    Defendant Elizabeth N. Pitman ("Pitman") has been a Medical Properties director since February 2018.  She was the Chair and a member of Medical Properties' Risk Committee from at least April 2022 to at least April 2024.  Medical Properties paid defendant Pitman the following compensation:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2023 | $175,000 | $123,163 | $298,163 |
| 2022 | $160,000 | $125,475 | $285,475 |
| 2021 | $137,500 | $128,638 | $266,138 |
| 2020 | $112,500 | $81,707 | $194,207 |
| 2019 | $105,000 | $107,798 | $212,798 |

Defendant Pitman is a citizen of Alabama.

30.     Defendant Caterina A. Mozingo ("Mozingo") has been a Medical Properties director since February 2020.  She was a member of Medical Properties' Risk Committee from at least April 2022 to at least April 2024.  Medical Properties paid defendant Mozingo the following compensation:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2023 | $145,000 | $123,163 | $268,163 |
| 2022 | $145,000 | $125,475 | $270,475 |
| 2021 | $137,500 | $128,638 | $266,138 |
| 2020 | $86,250 | $81,707 | $167,957 |

Defendant Monzingo is a citizen of Alabama.

31.     Defendant Emily W. Murphy ("Murphy") has been a Medical Properties director since February 2022.  She was a member of Medical Properties' Risk Committee since at least April 2024.  Medical Properties paid defendant Murphy the following compensation:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2023 | $115,000 | $123,163 | $238,163 |
| 2022 | $86,250 | $121,288 | $207,538 |

Defendant Murphy is a citizen of Virginia.

32.     The defendants identified in ¶¶21-24 are referred to herein as the "Officer Defendants."  The defendants identified in ¶¶21-22, 25-31 are referred to herein as the "Director Defendants."  The defendants identified in ¶¶26-28 are referred to herein as the "Audit Committee Defendants."   The defendants identified in ¶¶21-22, 29-31 are referred to herein as the "Risk Committee Defendants."  The defendants identified in ¶¶21-26 are referred to herein as the "Insider Selling Defendants."  Collectively, the defendants identified in ¶¶21-31 are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

**Fiduciary Duties**

33.     By reason of their positions as officers and directors of the Company, each of the Individual Defendants owed and owe Medical Properties and its shareholders fiduciary obligations of care and loyalty, and were and are required to use their utmost ability to control and manage Medical Properties in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Medical Properties and not in furtherance of their personal interest or benefit.

34.     To discharge their duties, the officers and directors of Medical Properties were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of Medical Properties were required to, among other things:

(a)     disseminate accurate and truthful information with respect to Medical Properties' financial condition and results of operations, and to correct promptly and public statements issued by Medical Properties which had become materially false or misleading;

(b)     conduct the affairs of the Company in an efficient, business-like manner in compliance with all applicable laws, rules, and regulations so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock; and

(c)     remain informed as to how Medical Properties conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws.

**Breaches of Duties**

35.     The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of Medical Properties, the absence of good faith on their part, and a reckless disregard for their duties to the Company that the Individual Defendants were aware or reckless in not being aware posed a risk of serious injury to the Company.

36.     The Individual Defendants breached their duty of loyalty by allowing defendants to cause, or by themselves causing, the Company to issue materially false and misleading statements, improper practices that wasted the Company's assets, and caused Medical Properties to incur substantial damage.

37.     The Individual Defendants, because of their positions of control and authority as officers and directors of Medical Properties, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.  The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions.  As a result, and in addition to the damage the Company has already incurred, Medical Properties has expended, and will continue to expend, significant sums of money.

**Additional Duties of the Audit Committee Defendants**

38.     In addition to these duties, under the Audit Committee's Charter in effect since November 11, 2010, the Audit Committee Defendants, defendants Dawson, Sparks, and Thompson, owed specific duties to Medical Properties to assist the Board in overseeing the integrity of the Company's financial statements and the system of disclosure controls and procedures over financial reporting.  Moreover, the Audit Committee's Charter provides:

> The committee shall discuss with management and independent auditors significant financial reporting issues and judgment made in connection with preparation of the

Company's financial statements, including significant changes in the selection or application of accounting principles, major issues as to the adequacy of internal controls, and any special steps adopted in light of material control deficiencies.

*       *       *

The Committee shall meet with Company senior management periodically to review:

- Major financial risk exposures.
- Material legal issues.
- Plans for disaster recovery.
- Risk Management activities.
- Business issues which may affect financial results.
- Ethical standards and conduct…

The Committee shall discuss with management the company's major financial risk exposure and the steps management has taken to monitor and control such exposure, including the Company's risk assessment and risk management policies.

*       *       *

The Committee shall prepare the report required by the rules of the Commission to be included in the Company's proxy statement for its annual meeting of stockholders.

39.    Accordingly, the Audit Committee Defendants failed to oversee the Company's financial statements.  If the Audit Committee Defendants had adequately overseen the Company's operations, Medical Properties would not have to record millions of dollars in impairment charges and write-offs.

**Additional Duties of the Risk Committee Defendants**

40.    In addition to these duties, the Risk Committee Defendants, defendants Aldag, Hamner, Pitman, Monzingo, and Murphy, owed specific duties to Medical Properties to assist the Board in in its risk management and risk assessment activities, including through oversight of risks related to: (i) business continuity; (ii) revenue concentration and the financial health and operational status of the Company's tenants and operators; (iii) modifications to the Company's

- 14 -

strategies; (iv) industry trends and general economic conditions; (v) entrance into new markets; (vi) privacy concerns and security breaches; and (vii) federal and state regulations.  According to the Company's most recent Proxy Statement filed with the SEC on April 17, 2024, the responsibilities of the Risk Committee also include monitoring guidelines, policies, and processes for monitoring and mitigating the various risks facing the Company.[2]  Accordingly, the Risk Committee Defendants have failed to mitigate risks when they allowed the Individual Defendants to conceal the financially distressed tenants with materially false and misleading statements.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

41.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and assisted each other in breaching their respective duties.

42.    During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) deceive the investing public, including shareholders of Medical Properties, regarding the Individual Defendants' management of Medical Properties' operations and the related risks to the Company's business; (ii) facilitate the Insider Selling Defendants' illicit sale of over $65.6 million of  their personally held Company shares while in possession of material, nonpublic information; and (iii) enhance the Individual Defendants' executive and directorial positions at Medical Properties and the profits, power, and prestige that the Individual Defendants enjoyed as a result of holding these positions.

---

[2] The Company's Risk Committee Charter is not public.

In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

43.    The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, and unjust enrichment; and to conceal adverse information concerning the financially distressed tenants.

44.    The Individual Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company to purposefully or recklessly ignore the financially distressed state of the Company's tenants.   Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of herein.

45.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.   In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

**<u>BACKGROUND</u>**

46.    Medical Properties is a self-advised REIT that acquires and develops healthcare facilities.   These facilities are then leased to healthcare companies under long-term triple net

leases,[3] which require the tenant to bear most of the costs associated with the property. The Company has a global footprint with investments in 444 facilities (approximately 44,000 licensed beds), in the United States, Europe, Australia, and Colombia. Medical Properties conducts substantially all of its business operations through one of its subsidiaries, MPT.

47.     The Company also extends mortgage loans to healthcare operators collateralized by the healthcare operators' real estate assets. In addition, the Company makes loans to certain tenants through Medical Properties' taxable REIT subsidiaries ("TRS"), the proceeds of which are typically used for working capital and other purposes. Additionally, Medical Properties occasionally makes non-controlling investments in its tenants as investments in unconsolidated operating entities. These investments are typically made in conjunction with larger real estate transactions with the tenant that allow the Company to share in that tenant's profits and losses, as well as affording the Company certain minority rights and protections.

48.     The ability of Medical Properties' tenants to make rent and loan payments affects the Company's financial statements. The Company's key financial metrics are net income, "funds from operations" (referred to as "FFO"), and "normalized funds from operations" (referred to "NFFO"). FFO is a metric that begins with net income and backs out: (i) gains or losses on sales of real estate; (ii) impairment charges on certain assets; (iii) depreciation and amortization expense; and (iv) income or loss attributed to unconsolidated partnerships and joint ventures. NFFO begins with FFO and backs out financial results from: (i) unanticipated or non-core corporate events; and (ii) accounting changes. Accordingly, it is important for the Individual Defendants to accurately

---

[3] A triple net lease is a lease agreement on a property where the tenant promises to pay all expenses, including real estate taxes, building insurance, and maintenance. These expenses are in addition to the cost of rent and utilities.

and timely record impairment charges and write-offs so that investors can see a true picture of the Company's operations.

**Medical Properties' Business Is Reliant Upon Its Tenants**

49.     According to the Company's Annual Report on Form 10-K for the year ended December 31, 2022, filed with the SEC on March 1, 2023, the Company's top tenants included Steward and Prospect.  As of December 31, 2022, Steward and Prospect represented 24.2% and 7.5%, respectively, of the Company's total assets.  For 2021 and 2022, revenue from each of Steward and Prospect individually represented more than 10% of Medical Properties' total revenues.

50.     Steward and its affiliates lease forty-one facilities across six different markets from Medical Properties pursuant to two master lease agreements (one of which covers the eight properties that are part of the joint venture with Macquarie Asset Management).  The master leases are basically identical and have a fixed term ending October 2041 with one remaining five-year extension option, plus annual inflation-based escalators.  As of December 31, 2022, these facilities had an average remaining fixed lease term of 18.8 years.  The remaining five-year extension option must include all leased properties within the respective master lease, if exercised.

51.     On January 8, 2021, the Company made a $335 million loan to affiliates of Steward, the terms of which provide the Company opportunities for participation in the value of Steward's growth.  All of the proceeds from this loan were paid to Steward's former private equity sponsor to redeem a similarly sized convertible loan.  Finally, Medical Properties holds a 9.9% equity investment in Steward worth approximately $126 million.

52.     Prospect and its affiliates lease thirteen facilities pursuant to two master lease agreements.  Both master leases had initial fixed terms of fifteen years (ending in August 2034)

and contain two extension options of five years and one extension option of four years and nine

months, plus annual inflation-based escalators.

## THE INDIVIDUAL DEFENDANTS KNEW THAT THE COMPANY'S
## TOP TENANTS WERE FINANCIALLY DISTRESSED

53.     The Individual Defendants knew that a material amount of its tenants, including

Prospect and Steward, were financially distressed.   On July 31, 2020, the Private Equity

Stakeholder Project, a nonprofit group whose mission is to bring transparency and accountability

to the private equity industry and empower impacted communities, stated that a transaction

between Medical Properties and Prospect left Prospect in a worse financial position than it was in

prior to the transaction.  Further, Prospect's ability to pay rent to Medical Properties was tenuous.

In particular, the Private Equity Stakeholder Project stated:

> *[T]he sale-leaseback of almost all of Prospect's real estate [to Medical Properties]*
> *left [Prospect] in a worse financial position than before the transaction.*

> \*       \*       \*

> In 2019, in an effort to pay down some of the existing $1.1 billion debt it had
> accrued ... Prospect sold much of its hospitals' real estate to ... Medical Properties
> Trust and leased it back.  Prospect ... characterized the sale-leaseback transaction
> as beneficial to the hospital company, though this is misleading; the sale-leaseback
> merely replaced debt with lease liabilities and left Prospect with fewer assets.

> \*       \*       \*

> *Prospect pays Medical Properties Trust around $116 million per year in rent.*
> *Even before COVID-19, it was not clear how Prospect would be able to pay the*
> *rent it owes Medical Properties Trust*[.]

54.     On September 30, 2020, *ProPublica* published an article pointing out Prospect's

poor financial condition, including shortfalls at the Pennsylvania Properties.  In particular, the

article stated:

> Paramedics for Prospect's hospital near Philadelphia told ProPublica that they've
> repeatedly gone to fuel up their ambulances only to come away empty at the pump:

***Their hospital-supplied gas cards were rejected because Prospect hadn't paid its bill***. A similar penury afflicts medical supplies. "Say we need 4x4 sponges, dressing for a patient, IV fluids," said ***Leslie Heygood, a veteran registered nurse at one of Prospect's Pennsylvania hospitals, "we might not have it on the shelf because it's on 'credit hold' because they haven't paid their creditors."***

\*       \*       \*

As elsewhere, ***Prospect's failure to pay bills on time has delayed repairs and resulted in supply shortages***. At Delaware County Hospital [in Pennsylvania], veteran nurse Angela Neopolitano said ... "Creditors would not come in to fix things because the hospital owed them money[.]"

55.      In Rhode Island, under the Hospital Conversions Act, R.I. Gen. Laws Section 23-17.14-1, *et seq*., the Attorney General is required to review any proposed conversions involving a for-profit corporation as an acquirer.  On June 1, 2021, the Rhode Island Attorney General issued a "Decision" in a hospital change-of-ownership proceeding noting serious financial shortfalls at Prospect.  The Decision pointed out Prospect's financially distressed state, including, but not limited to, Prospect's liabilities exceeding its assets by over $1 billion.  The Decision stated, in relevant part:

***Our investigation revealed a company [Prospect] whose ... liabilities now exceed assets by over $1 billion [as of September 30, 2020].***  ...  [T]his debt-to-asset ratio raises a concern for the Attorney General that the national company ... can become unstable, disrupting and even threatening Rhode Island's third largest hospital system.  In other words, PMH [Prospect Medical Holdings] is a system that is at risk of developing a la***ck of financial ability to respond to the volatility of the healthcare market***, putting every hospital in its system ... at risk of reduction in services, sale, or closure.

\*       \*       \*

***PMH ... has and continues to struggle financially. See, e.g., PYA Report 19 (explaining that "PMH has reported limited liquidity and a highly leveraged position in recent fiscal years")***[.]  During the 6- year period from ... 2015 to ... 2020, the company took a cumulative comprehensive loss of $603 million, and has seen its long-term debt increase from $451 million in ... 2015 to almost $1.6 billion in ... 2020.

\*       \*       \*

What is more, the company's ballooning debt has not always translated into enough liquidity to pay its bills.... ***PMH is a highly leveraged company that continues to have large annual losses***[.]

\* \* \*

***PMH's ability to meet its medium- and long-term debt obligations are becoming more uncertain with each passing year.***

\* \* \*

Another metric used to gauge a company's financial health is the quick ratio. ... This ratio measures a company's liquidity, that is, its ability to cover short-term financial obligations such as payroll, vendor invoices, and outstanding or impending interest payments.

\* \* \*

In essence, the lower the value of this ratio, the more likely it is that a company will be unable to pay its bills....

The following chart ("Table 2") plots PMH's quick ratios from ... 2015 through ... 2020, which are based on PMH's audited financial statements and calculated by the Attorney General's financial expert.

\* \* \*

As Table 2 shows, PMH's quick ratio was under 1.0 at the end of every Fiscal Year from 2015 to 2020, meaning that ***the company had less than $1 to cover every $1 in short-term financial obligations***.

\* \* \*

The Attorney General sees this as creating a circumstance where ***PMH will not be able to find operational cash when it is needed. See Carris Report 9 ("PMH has sold substantially all its real property [to Medical Properties]. There is very little left to leverage to provide liquidity.")***[.]

\* \* \*

PMH's ratio lagged the median ratio of publicly traded hospital companies, which remained over 1.0 from ... 2015 to ... 2019. This indicates that PMH was at a relatively higher risk of running out of cash or other liquid assets to meet its short-term financial obligations than its publicly traded counterparts.

56.     The Rhode Island Attorney General also observed that Prospect's lease and loan payments owed to Medical Properties added to Prospect's financial strain.   In particular, the Decision stated:

> ***A considerable portion of the approximately $3.1 billion in liabilities currently on PMH's books is the result of three transactions PMH entered into with Medical Properties Trust, Inc. ("MPT") in 2019.***   ...   In the first of these, PMH sold its hospitals in Connecticut, Pennsylvania, and all but one of its hospitals in California to MPT for approximately $1.4 billion. ...   MPT then leased these hospitals back to PMH.   ...   PMH, according to its agreement with MPT, will pay rent for at least the next 15 years in order to continue operating....   In the second transaction, PMH took out a ~$51 million mortgage on one of its California hospitals; this mortgage is at a 7.5% interest rate per annum....   And in the third transaction, PMH signed a promissory note in exchange for $113 million from MPT, referred to herein as the "TRS Note."   ...   Interest on the note is 7.5% per annum and subject to an annual escalation clause.

> \*       \*       \*

> The Attorney General has addressed this threat to the Rhode Island Hospitals' real estate by prohibiting it from being pledged or used as collateral unless approved by the Attorney General.

57.     The Rhode Island Attorney General's expert witness further concluded that Prospect will likely face a liquidity crisis within the next 18 to 24 months.   In particular, the Decision stated: "While I do not believe that PMH faces a liquidity crisis in the next 12 months, I believe it will come sooner rather than later, probably within 18 to 24 months." "They cannot continue to have significant operating losses and fund necessary capital projects and expect to survive long-term."

58.     The Rhode Island Attorney General also relied on a second financial advisory firm, PYA, P.C. ("PYA"), which analyzed Prospect's financial condition.   PYA identified major weaknesses in Prospect's financial stability through year-end 2020, stating:

- Prospect is "***[n]ot generating cash sufficient to fund operations***";

- "PMH's leveraged position has increased to a point where, at September 30, 2020, PMH's total liabilities exceeded total assets by approximately $1.06 billion";

- Prospect has "[a]ccumulated net operating losses FY2015 – FY2020 [of] $88.1 million"; and

- "***PMH face[s] long-term financial viability risks***."

59.     On February 14, 2022, the *Wall Street Journal* (the "*WSJ*") pointed out the Company was helping Steward make rent payments.  The *WSJ* reported that "Former MPT employees familiar with the company's transactions said they saw deals with Steward [which was Medical Properties' largest tenant] as a way for MPT to provide it with cash as it notched losses, which in turn helped Steward make its rent payments and kept MPT growing."  The *WSJ* also reported on Steward's financially distressed state.  In particular, the *WSJ* stated:

> When Steward ran into financial trouble, Medical Properties Trust provided it more than $700 million through a series of complex deals....  [For example, Medical Properties] ***provided $200 million to buy Steward assets valued at $27 million***.

*       *       *

> Steward accounted for 30% of Medical Properties Trust's revenue last year.  ***Steward lost more than $400 million in 2020 and reported nearly $1 billion of unpaid supplier expenses and other bills***....  The company also faces audits by the Internal Revenue Service and state authorities.

*       *       *

> [A]t the end of last year, [Steward's] short-term liabilities significantly exceeded its current assets.

60.     On March 9, 2022, the Private Equity Stakeholder Project noted additional financial difficulties at the Pennsylvania Properties.  The Private Equity Stakeholder Project reported that "'Last month, Prospect closed the maternity ward at Delaware County Memorial and suspended all inpatient services at Springfield.  It is closing the 10-bed hospice unit at Taylor Hospital Friday.'"

61.     On September 19, 2022, Credit Suisse issued an analyst report regarding Medical Properties.  The report noted that Prospect was in a "dire financial situation[.]"  Credit Suisse further warned of Prospect's poor financial condition, stating:

Prospect, MPW's third largest tenant ... reported [a] ... rent coverage [ratio] of 0.6x in 2Q22.... ***Though a smaller tenant than Steward, this presents a much larger concern in our opinion given the dire financial situation [at Prospect], string of executive layoffs, staff shortages and recent legal action by Delaware County in Pennsylvania to force Prospect to keep essential parts of its hospitals running. [There are] poor financial condition[s] and operating challenges at quite a few of the Prospect operated hospitals that are owned by MPW***.  ...  We note that Prospect was actively seeking to sell its operations in Delaware County, Pennsylvania and in the State of Connecticut but the Delaware County, Pennsylvania transaction with ChristianaCare has fallen apart which again raises concern about potential sources of cash for Prospect to meet its obligations.

62.     On November 4, 2022, RBC Capital Markets ("RBC") also issued an analyst report regarding Medical Properties.  The report stated that Prospect was in poor financial condition.  In particular, RBC stated that "[the] Prospect situation [is] more uncertain....  This operator has struggled particularly in its Connecticut and Pennsylvania portfolios....  The Pennsylvania portfolio ... has been cash flow negative (even before rent).  ...  The PA portfolio in particular seems at risk[.]"

63.     The *WSJ's* reporting, the Decision, *ProPublica's* reporting, the Private Equity Stakeholder Project's reporting, Credit Suisse's reporting, and RBC's reporting was later supported by the Viceroy Report and then confirmed on February 23, 2023, when the Company disclosed that it was recording a $283 million impairment charge consisting of: (i) a $171 million write-down of assets related to the Pennsylvania Properties; and (ii) a $112 million write-off of unbilled rent owed by Prospect.  Prior to the February 23, 2023 disclosure, the Individual Defendants concealed the scheme by making materially false and misleading statements.  Then, on January 5, 2024, the *WSJ's* reporting was validated when Medical Properties announced it planned to accelerate efforts to recover uncollected rents from Steward.

### THE INDIVIDUAL DEFENDANTS CONCEAL THE FINANCIALLY DISTRESSED TENANTS WITH MATERIALLY FALSE AND MISLEADING STATEMENTS

64.     The Individual Defendants concealed the financially distressed tenants. Specifically, from July 15, 2019 through February 22, 2023, the Individual Defendants caused the Company to issue materially false and misleading statements.

65.     On July 15, 2019, the Company filed a Form 8-K that announced that on July 10, 2019, the Company acquired fourteen hospitals from Prospect. As part of the agreement, Medical Properties would acquire the properties and lease them back to Prospect, who would then pay rent. The hospitals included the Pennsylvania Properties. The Form 8-K described the properties as follows:

### *Acquisition of Prospect Hospital Portfolio*

On July 10, 2019, the Operating Partnership entered into definitive agreements pursuant to which certain of its subsidiaries will invest approximately $1.55 billion in a portfolio of 14 acute care hospitals and two behavioral health facilities currently owned and operated by Prospect Medical Holdings, Inc. ("Prospect").

Under the terms of the agreements, certain subsidiaries of the Operating Partnership will acquire from Prospect all of its interests in the real estate of 11 acute care hospitals and two behavioral health facilities for an aggregate purchase price of approximately $1.4 billion. Such hospitals and facilities will then be leased back to Prospect under two separate master leases. In addition, (i) a subsidiary of the Operating Partnership will make a mortgage loan in the amount of approximately $51.3 million, secured by a first mortgage on an acute care hospital, and (ii) a subsidiary of the Company's taxable REIT subsidiary will make a term loan of approximately $112.9 million, which will mature upon the earlier of three years or the satisfaction of certain conditions. After the maturity of the term loan and upon satisfaction of certain conditions, other subsidiaries of the Operating Partnership will acquire from Prospect all of its interests in the real estate of two additional acute care hospitals, which real estate will be added to one of the master leases. The master leases, mortgage loan, and term loan will be cross-defaulted and cross-collateralized. The master leases and mortgage loan will have substantially similar terms, with 15-year fixed term subject to three extension options, plus annual increases at the greater of CPI or 2%, with a cap of 4%.

The table below sets forth pertinent details with respect to the hospitals and behavioral health facilities in the Prospect portfolio:

| Hospital | City | State | Form of Investment | Hospital Type | Licensed Beds |
|---|---|---|---|---|---|
| Southern CA Hospital at Hollywood | Los Angeles | California | Fee Simple | Acute | 100 |
| Southern CA Hospital at Van Nuys | Van Nuys | California | Fee Simple | Behavioral | 57 |
| Southern CA Hospital at Culver City | Culver City | California | Fee Simple | Acute | 420 |
| Los Angeles Community Hospital at Norwalk | Norwalk | California | Fee Simple | Acute | 50 |
| Los Angeles Community Hospital | Los Angeles | California | Fee Simple | Acute | 129 |
| Los Angeles Community Hospital at Bellflower | Bellflower | California | Fee Simple | Behavioral | 144 |
| Foothill Regional Medical Center | Tustin | California | Mortgage Loan | Acute | 177 |
| Manchester Memorial Hospital | Manchester | Connecticut | Fee Simple | Acute | 249 |
| Rockville General Hospital | Vernon | Connecticut | Fee Simple | Acute | 102 |
| Waterbury Hospital | Waterbury | Connecticut | Fee Simple | Acute | 357 |
| Crozer-Chester Medical Center | Upland | Pennsylvania | Fee Simple | Acute | 300 |
| Springfield Hospital | Springfield | Pennsylvania | Fee Simple | Acute | 25 |
| Taylor Hospital | Ridley Park | Pennsylvania | Fee Simple | Acute | 105 |
| Delaware County Memorial Hospital | Drexel Hill | Pennsylvania | Fee Simple | Acute | 168 |
| **Total Licensed Beds\*** | | | | | 2,383 |

The agreements provide for the potential for a future purchase price adjustment of up to an additional $250.0 million based on achievement of certain performance thresholds over a three-year period. Any such adjustment will be added to the lease base upon which the Company will earn a return in accordance with the master leases.

Subject to customary closing conditions, the Company expects to consummate the transactions described above in the second half of 2019 with respect to all of the real estate other than the two properties subject to a delayed closing.

66.     On August 1, 2019, Medical Properties issued a press release announcing its financial results for the second quarter ended June 30, 2019.  For the quarter, the Company reported net income of $79.4 million, compared to $111.6 million for the same quarter in 2018.  In addition, the Company reported NFFO, which is a key metric for REITs, of $120.9 million, compared to $129.9 million for the same quarter in 2018.  These results were also provided in the Company's Quarterly Report on Form 10-Q for the second quarter filed with the SEC on August 9, 2019.  These metrics were overstated due to a failure to record necessary asset impairment charges and write-offs.

67.     On October 31, 2019, Medical Properties issued a press release announcing its financial results for the third quarter ended September 30, 2019.  For the quarter, the Company reported net income of $89.8 million, compared to $736 million for the same quarter in 2018, resulting from $695.2 million of gains from sales that include a joint venture transaction by which

Medical Properties sold a 50% interest in a portfolio of seventy-one German post-acute hospitals. In addition, NFFO for the third quarter was $147.5 million, compared to $127.2 million for the same quarter in 2018. These results were also provided in the Company's Quarterly Report on Form 10-Q for the third quarter filed with the SEC on November 12, 2019.

68.     On February 6, 2020, Medical Properties issued a press release announcing its financial results for the fourth quarter and full year ended December 31, 2019. For the quarter and full year, the Company reported net income of $130 million and $375 million, respectively, compared to $78 million and $1.02 billion, respectively, for the prior year. In addition, NFFO for the fourth quarter and full year was $171 million and $557 million, respectively, compared to $112 million and $501 million, respectively, for the prior year. The Company also reported a balance of $2.1 billion in the "Investment in financing leases" line item on its Balance Sheet, which included the Company's real estate assets related to the Prospect leases, among other leases. That line item consisted of the aggregate future "lease payments receivable" to be paid by Prospect over the life of the leases (net of certain adjustments), plus the value ("residual value") of the real estate leased to Prospect.

69.     On February 27, 2020, Medical Properties filed its Annual Report on Form 10-K for the year ended December 31, 2019, with the SEC. The Form 10-K was signed by defendants Aldag, Hamner, Dawson, Pitman, Sparks, Stewart, and Thompson. The Form 10-K falsely assured investors that the value of the Company's facilities was not impaired during 2019. In particular, the Form 10-K stated:

> When circumstances indicate a possible impairment of the value of our real estate investments, we review the recoverability of the facility's carrying value. The review of the recoverability is generally based on our estimate of the future undiscounted cash flows from the facility's use and eventual disposition. Our forecast of these cash flows considers factors such as expected future operating income, market and other applicable trends, and residual value, as well as the

effects of leasing demand, competition, and other factors. If impairment exists due to the inability to recover the carrying value of a facility on an undiscounted basis, an impairment loss is recorded to the extent that the carrying value exceeds the estimated fair value of the facility. ***We do not believe that the value of any of our facilities was impaired at December 31, 2019***; however, given the highly specialized aspects of our properties no assurance can be given that future impairment charges will not be taken.

70.     On April 29, 2020, Medical Properties issued a press release announcing its financial results for the first quarter ended March 31, 2020.  For the quarter, the Company reported net income of $81 million, compared to $75.8 million for the same quarter in 2019.  In addition, NFFO for the first quarter was $191.2 million, compared to $117.8 million for the same quarter in 2019.  These results were also provided in the Company's Quarterly Report on Form 10-Q for the first quarter filed with the SEC on May 11, 2020.

71.     On July 30, 2020, Medical Properties issued a press release announcing its financial results for the second quarter ended June 30, 2020.  For the quarter, the Company reported net income of $109.5 million, compared to $79.4 million for the same quarter in 2019.  In addition, NFFO for the second quarter was $199.6 million, compared to $120.9 million for the same quarter in 2019.  These results were also provided in the Company's Quarterly Report on Form 10-Q for the second quarter filed with the SEC on August 7, 2020.

72.     On October 29, 2020, Medical Properties issued a press release announcing its financial results for the third quarter ended September 30, 2020.  For the quarter, the Company reported net income of $131.1 million, compared to $89.8 million for the same quarter in 2019.  In addition, NFFO for the third quarter was $220.7 million, compared to $147.5 million for the same quarter in 2019.  These results were also provided in the Company's Quarterly Report on Form 10-Q for the third quarter filed with the SEC on November 9, 2020.

73.     On February 4, 2021, Medical Properties issued a press release announcing its financial results for the fourth quarter and full year ended December 31, 2020.  For the quarter and full year, the Company reported net income of $110 million and $431 million, respectively, compared to $130 million and $375 million, respectively, for the prior year.  In addition, NFFO for the fourth quarter and full year was $220 million and $831 million, respectively, compared to $171 million and $557 million, respectively, for the prior year.

74.     On March 1, 2021, Medical Properties filed its Annual Report on Form 10-K for the year ended December 31, 2020, with the SEC.  The Form 10-K was signed by defendants Aldag, Hamner, Dawson, Pitman, Sparks, Stewart, Thompson, and Mozingo.  The Form 10-K falsely assured investors that the value of the Company's facilities was not impaired during 2020. In particular, the Form 10-K stated:

> When circumstances indicate a possible impairment of the value of our real estate investments, we review the recoverability of the facility's carrying value. The review of the recoverability is generally based on our estimate of the future undiscounted cash flows from the facility's use and eventual disposition. Our forecast of these cash flows considers factors such as expected future operating income, market and other applicable trends, and residual value, as well as the effects of leasing demand, competition, and other factors. If impairment exists due to the inability to recover the carrying value of a facility on an undiscounted basis, an impairment loss is recorded to the extent that the carrying value exceeds the estimated fair value of the facility. In making estimates of fair value for purposes of impairment assessments, we will look to a number of sources including independent appraisals, available broker data, or our internal data from recent transactions involving similar properties in similar markets. ***We do not believe that the value of any of our facilities was impaired at December 31, 2020***; however, given the highly specialized aspects of our properties no assurance can be given that future impairment charges will not be taken.

75.     On April 26, 2021, Medical Properties filed its Proxy Statement on Form DEF 14A with the SEC (the "2021 Proxy").  Defendants Aldag, Dawson, Hamner, Mozingo, Pitman, Sparks, Stewart, and Thompson solicited the 2021 Proxy Statement.  The 2021 Proxy Statement assured investors that the Board was overseeing and evaluating risks to the Company, stating:

Our Board plays a central role in overseeing and evaluating risks pertinent to our Company. While it is management's responsibility to identify and manage our risk exposure on a day-to-day basis, the Board routinely discusses these risks with management and actively oversees our risk-management procedures and protocols. The Board regularly receives reports from senior management on areas of material risk to the Company, including operational, financial, legal, regulatory and strategic risks. In addition, each of the Audit Committee, the Compensation Committee and the Ethics, Nominating and Corporate Governance Committee exercises oversight and provides guidance relating to the particular risks within the purview of each committee, as well as making periodic reports to the full Board. Our Board also oversees risk by means of the required approval by our Board of significant transactions and other decisions, including material acquisitions or dispositions of property, material capital markets transactions, significant capital improvement projects and important employment-related decisions.

76.     On April 29, 2021, Medical Properties issued a press release announcing its financial results for the first quarter ended March 31, 2021.  For the quarter, the Company reported net income of $164 million, compared to $81 million for the same quarter in 2020.  In addition, NFFO for the first quarter was $244 million, compared to $191 million for the same quarter in 2020.  These results were also provided in the Company's Quarterly Report on Form 10-Q for the first quarter filed with the SEC on May 10, 2021.

77.     On July 29, 2021, Medical Properties issued a press release announcing its financial results for the second quarter ended June 30, 2021.  For the quarter, the Company reported net income of $115 million, compared to $109 million for the same quarter in 2020.  In addition, NFFO for the second quarter was $251 million, compared to $200 million for the same quarter in 2020.  These results were also provided in the Company's Quarterly Report on Form 10-Q for the second quarter filed with the SEC on August 9, 2021.

78.     On October 28, 2021, Medical Properties issued a press release announcing its financial results for the third quarter September 30, 2021.  For the quarter, the Company reported net income of $171 million, compared to $131 million for the same quarter in 2020.  In addition, NFFO for the third quarter was $263 million, compared to $221 million for the same quarter in

2020.  These results were also provided in the Company's Quarterly Report on Form 10-Q for the third quarter filed with the SEC on November 9, 2021.

79.   On February 3, 2022, Medical Properties issued a press release announcing its financial results for the fourth quarter and full year ended December 31, 2021.  For the quarter and full year, the Company reported net income of $207 million and $656 million, respectively, compared to $110 million and $431 million, respectively, for the prior year.  In addition, NFFO for the fourth quarter and full year was $279 million and $1,036 million, respectively, compared to $220 million and $831 million, respectively, for the prior year.

80.   On March 1, 2022, Medical Properties filed its Annual Report on Form 10-K for the year ended December 31, 2021 with the SEC.  The Form 10-K was signed by defendants Aldag, Hamner, Dawson, Mozingo, Pitman, Sparks, Stewart, and Thompson.  The Form 10-K falsely assured investors that the value of the Company's facilities was not impaired during 2020.  In particular, the Form 10-K stated:

> When circumstances indicate a possible impairment of the value of our real estate investments, we review the recoverability of the facility's carrying value. The review of the recoverability is generally based on our estimate of the *future undiscounted cash flows* from the facility's use and eventual disposition. Our forecast of these cash flows considers factors such as *expected future operating income*, market and other applicable trends, and residual value, as well as the effects of leasing demand, competition, and other factors. If impairment exists due to the inability to recover the carrying value of a facility on an undiscounted basis, an impairment loss is recorded to the extent that the carrying value exceeds the estimated fair value of the facility. In making estimates of fair value for purposes of impairment assessments, we will look to a number of sources including independent appraisals, available broker data, or our internal data from recent transactions involving similar properties in similar markets. *We do not believe that any of our facilities were impaired at December 31, 2021*; however, given the highly specialized aspects of our properties, no assurance can be given that future impairment charges will not be taken.

81.   On April 28, 2022, Medical Properties issued a press release announcing its financial results for the first quarter ended March 31, 2022.  For the quarter, the Company reported

net income of $632 million, compared to $164 million for the same quarter in 2021.  In addition, NFFO for the first quarter was $282 million, compared to $244 million for the same quarter in 2021.  These results were also provided in the Company's Quarterly Report on Form 10-Q for the first quarter filed with the SEC on May 10, 2022.

82.     Also, on April 28, 2022, Medical Properties filed its Proxy Statement on DEF 14A with the SEC (the "2022 Proxy").  Defendants Aldag, Dawson, Hamner, Mozingo, Murphy, Pitman, Sparks, Stewart, and Thompson solicited the 2022 Proxy.  Similar to the 2021 Proxy, the 2022 Proxy assured investors that the Board was overseeing and evaluating risks to the Company.

83.     On August 3, 2022, Medical Properties issued a press release announcing its financial results for the second quarter ended June 30, 2022.  For the quarter, the Company reported net income of $190 million, compared to $115 million for the same quarter in 2021.  In addition, NFFO for the second quarter was $275 million, compared to $251 million for the same quarter in 2021.  These results were also provided in the Company's Quarterly Report on Form 10-Q for the first quarter filed with the SEC on August 9, 2022.

84.     On October 27, 2022, Medical Properties issued a press release announcing its financial results for the third quarter ended September 30, 2022.  For the quarter, the Company reported net income of $222 million, compared to $171 million for the same quarter in 2021.  In addition, NFFO for the third quarter was $272 million, compared to $263 million for the same quarter in 2021.  These results were also provided in the Company's Quarterly Report on Form 10-Q for the first quarter filed with the SEC on November 9, 2022.

85.     The above statements were materially false and misleading and failed to disclose material facts concerning the Company's operations.  In particular, the above statements failed to disclose that: (i) the Individual Defendants caused the Company to delay recording a $283 million

impairment charge related to Prospect and the Pennsylvania Properties; and (ii) failed to reveal that Steward was financially distressed which would cause uncollected rent payments.

### THE TRUTH BEGINS TO EMERGE WHEN THE VICEROY REPORT ACCUSES THE COMPANY OF A SCHEME TO CONCEAL THE FINANCIALLY DISTRESSED STATE OF THE COMPANY'S TOP TENANTS

86.    On January 26, 2023, the truth about the Company's fiduciaries' scheme began to emerge when Viceroy published the Viceroy Report which confirmed previous allegations by the *WSJ*, Rhode Island Attorney General, *ProPublica,* Private Equity Stakeholder Project, Credit Suisse, and RBC.  As a result, the Company's net income, FFO, and NFFO were inflated because the necessary impairment charges and write-offs of rent receivables were not being recorded.

87.    The Viceroy Report confirmed that executive incentives combined with "accounting gimmicks" encouraged and allowed the wrongdoing to occur.  The Company's executives are compensated based, primarily, on NFFO and "Acquisitions."  Viceroy stated that NFFO was a "completely unsuitable metric" because it did not account for distressed straight-lined rent.  Further, the compensation structure that heavily relied on NFFO and acquisitions "has fostered and encouraged management's trigger-happy acquisition spree and does not disincentive bad behavior.  It's important to note in analysis that executive incentives are aligned with fraud … and creative accounting."

88.    The Viceroy Report also analyzed the financial health of Steward.  Steward was in complete disarray until "MPW came to the rescue in 2016 through a sale-and-leaseback arrangement."  Following this transaction, Medical Properties continues to have a "mutually parasitic relationship with [Steward]" which has failed to achieve profitability despite scaling its operations.  A report from the Massachusetts Center for Health Information and Analysis shows that Steward is at the "bottom of the ladder in almost every financial metric" amongst hospitals in

Massachusetts.  An analysis by Viceroy confirmed how unprofitable Steward has been from 2017 through 2018 and 2020:[4]

| Steward's Financials | | | | |
|---|---|---|---|---|
| | 2017 | 2018 | 2019 | 2020 |
| Gross Profit | $(321,597) | $(269,186) | $125,313 | $(439,161) |

89.     Steward's distressed state has impacted its ability to maintain its operations and even pay its staff.  On December 30, 2022, Advanced Clinical Experts, PLLC filed an action against Steward in the 162nd Judicial District Court of Dallas County, Texas, for non-payment of wages.  Additionally, Medix Staffing Solutions, Inc., a staffing service, filed an action in the U.S. District Court for the Northern District of Texas, Dallas Division, against Steward for failing to pay over half a million dollars in staffing services.

90.     The Viceroy Report was similar to the *WSJ's*, the Rhode Island Attorney General's, *ProPublica's*, the Private Equity Stakeholder Project's, Credit Suisse's, and RBC's accusations. There are now several sources accusing the Company of having financially distressed tenants.

**The Individual Defendants Record a $283 Million Impairment Charge, Confirming Viceroy's, the *WSJ's*, the Rhode Island Attorney General's, *ProPublica's*, the Private Equity Stakeholder Project's, Credit Suisse's, and RBC's Accusations**

91.     On February 23, 2023, Medical Properties issued a press release announcing its financial results for the fourth quarter and full year ended December 31, 2022.  The press release validated some of the concerns in the Viceroy Report because Medical Properties reported a drastic reduction in net income and NFFO for the fourth quarter.  The Company also recorded a massive impairment charge, in part, because of unbilled rent to Prospect.  For the quarter and full year, the

---

[4] Steward's Financials represent dollars in thousands.

Company reported a net loss of ($140) million and net income of $903 million, respectively, compared to net income of $207 million and $656 million, respectively, for the prior year. In addition, NFFO for the fourth quarter and full year was $258 million and $1,088 million, respectively, compared to $279 million and $1,036 million, respectively, for the prior year. The Company's results also disclosed an impairment charge of $171 million relating to the Pennsylvania Properties and a write-off of $112 million on unbilled rent to Prospect. In particular, the press release stated:

> Fourth quarter 2022 net loss and full-year 2022 net income include a real estate impairment of approximately $171 million related to four properties leased to Prospect Medical Holdings ("Prospect") in Pennsylvania as well as a write-off of roughly $112 million in unbilled Prospect rent also included in Funds from Operations ("FFO") but excluded from normalized results[.]

92.     That same day, the Company disclosed that its longtime Chief Operations Officer and Executive Vice President, defendant McLean, was retiring effective September 1, 2023. Following the release of the February 23, 2023 press release, Medical Properties' stock plunged $2.13 per share, or approximately 17.5%, over several days from its previous closing price to close at $10.07 per share on March 1, 2023, erasing more than $1.27 billion in market capitalization.

93.     After this news broke, investors sued the Company and certain of its officers and directors for violating federal securities laws in the Securities Class Action. As a result, the Company faces hundreds of millions of dollars in liability. Additionally, the Company would face future write-offs and impairment charges stemming from the Company's fiduciaries entering the Company into transactions with tenants who are in financially poor condition.

**The Individual Defendants Report that the Company Needs to Write Off $98 Million from Steward Which Is Liquidating Assets to Pay for Outstanding Loans Owed to Medical Properties**

94.     On May 10, 2023, the Company filed its Quarterly Report on Form 10-Q for the first quarter ended March 31, 2023, with the SEC. The Form 10-Q disclosed that Steward sold

five operations to pay Medical Properties $150 million in proceeds for outstanding loans.  The facilities were severed from a master lease with Steward and the Company was required to write off approximately $94 million of straight-line rent receivables.  In particular, the Form 10-Q stated:

> On May 1, 2023, Catholic Health Initiatives Colorado ("CHIC"), a wholly owned subsidiary of CommonSpirit Health ("CommonSpirit"), acquired the Utah hospital operations of five general acute care facilities previously operated by Steward. As a result of this transaction, ***we expect to receive $150 million of proceeds from Steward to pay down outstanding loans***, $100 million of which we received on May 1, 2023. The new lease with CHIC for these Utah assets will have an initial fixed term of 15 years with annual escalation provisions. ***As part of this transaction, we severed these facilities from the master lease with Steward, and accordingly will accelerate the amortization of the associated in-place lease intangibles (approximately $288 million at March 31, 2023) and write-off approximately $94 million of straight-line rent receivables***. With this transaction, we expect to lower our overall asset concentration with Steward by approximately 4% and our revenue concentration by approximately 8%.

95.     As investors digested this information, Medical Properties' stock plunged by more than 9% in a single day, or $0.79 per share on May 12, 2023, to close at $7.64 per share, erasing $472.6 million in market capitalization.

**The Individual Defendants Report that the Company Needs to Write Off $225 Million in Uncollected Rent from Steward and Accelerate Efforts to Collect Rent from Steward**

96.     On January 4, 2024, Medical Properties issued a press release further validating the *WSJ's* and Viceroy's reporting on Steward's financially distraught state.  The Company announced plans to write off $225 million related to Steward's uncollected rent and accelerate the Company's efforts to recover uncollected rents and outstanding loan obligations from Steward.  The Company previously disclosed in its Quarterly Report on Form 10-Q for the third quarter of 2023 that Steward delayed paying a portion of its September and October rent to Medical Properties.  However, despite Steward obtaining additional working capital financing and selling its non-core laboratory business in the fourth quarter of 2023, Steward's liquidity had been negatively impacted by significant changes to vendors' payment terms.  As a result, Steward continued to make partial

monthly rent payments, and total unpaid rent under its consolidated master lease with Medical Properties is approximately $50 million as of December 31, 2023.

97.     The Company engaged Alvarez & Marsal Securities, LLC as its financial advisor and KTBS Law, LLP and Baker, Donelson, Bearman, Caldwell & Berkowitz, PC as legal advisors to advise the Company on its options to enable the recovery of uncollected rent and outstanding loans.  As a result, the Company has to write off consolidated straight-line rent receivables of approximately $225 million because "[t]here can be no assurance that … the Company will recover all of its deferred rent and loans outstanding to Steward."  In particular, the January 4, 2024 press release stated:

> **There can be no assurance that Steward will successfully execute its plans or that the Company will recover all of its deferred rent and loans outstanding to Steward. As a result, MPT cannot be assured that Steward will make all scheduled lease payments throughout the remaining approximate 22-year fully extended term of its master lease**. Accordingly, pursuant to generally accepted accounting principles, **the Company expects to record a non-cash charge in the fourth quarter of 2023 to write off consolidated straight-line rent receivables of approximately $225 million**, its approximately $25 million share of straight-line rent receivables related to the unconsolidated Massachusetts partnership and consolidated unpaid rent receivables of approximately $100 million (which includes the previously referenced $50 million related to the Norwood development). Furthermore, MPT routinely evaluates for indications of impairments to its real estate and other investments, including those related to Steward. Such evaluations are ongoing as of December 31, 2023, and no assurances can be provided that further impairment of real estate and non-real estate assets will not be taken with MPT's fourth quarter 2023 reporting.

98.     Following the issuance of the January 4, 2024 press release, Medical Properties' stock plunged by more than 32% over just two trading days, or $1.61 per share on January 8, 2024, to close at $3.39 per share, erasing $964.3 million in market capitalization.

### THE OFFICER DEFENDANTS WERE MOTIVATED TO MISSTATE THE COMPANY'S FINANCIAL STATEMENTS

99.     The Officer Defendants were incentivized by performance-based compensation to misstate the Company's financial statements.  The performance-based compensation consisted of

cash bonuses and stock awards.  Under the Company's performance-based compensation plan, the "cash bonus" was based largely on the results of the Company's earnings before interest, taxes, depreciation, and amortization ("EBITDA") and FFO.[5]

100.    Additionally, the Company's performance-based "stock award" plan was based primarily on the Company's EBITDA, FFO, and volume of acquisitions during the year.[6]  The Company's performance-based compensation plan was tied largely to the Company's net earnings, which are inflated if necessary impairment charges are not recorded.  The Company's acquisition activity was overly aggressive and included acquisitions even where the acquired properties would be leased to distressed tenants that could not afford the lease payments.  Those acquisitions contributed to stock awards granted.

101.    Although defendant Hanna's compensation was not publicly disclosed until the Proxy Statement filed with the SEC on April 17, 2024, he too was motivated to misstate the Company's financials.   The Company disclosed that the "overwhelming majority of our [executives'] compensation is tied to formulaic [performance-based] incentives."[7]  Accordingly, the Officer Defendants were motivated to delay any impairment charges and write-offs of rent receivables, which would have decreased the Company's EBITDA and FFO, and to make aggressive acquisitions leased quickly to distressed tenants.

_____

[5] *See* Medical Properties' Proxy Statement on Form DEF 14A filed with the SEC on April 24, 2020 (the "2020 Proxy") (20% of bonus was based on "Debt/EBITDA Ratio," 50% of bonus was based on "Normalized FFO Per Share Growth," and remainder was based on other factors); 2021 Proxy (20% of bonus was based on "EBITDA/Interest," 50% of bonus was based on "Normalized FFO per Share," and remainder was based on other factors); 2022 Proxy (same); Medical Properties' Proxy Statement on Form DEF 14A filed with the SEC on April 27, 2023 (the "2023 Proxy") (same).

[6] *See* Medical Properties 2020 Proxy (stock distribution plan was based on "EBITDA," "Acquisitions," and "ROE," i.e., return on equity); 2021 Proxy (30% of stock distribution plan was based on "FFO per Share Growth," 40% was based on "EBITDA," and 30% was based on "Acquisitions); 2022 Proxy (same); 2023 Proxy (same).

[7] *See* Medical Properties' 2022 Proxy.

102.    Importantly, defendants Aldag, Dawson, Hamner, Mozingo, Murphy, Pitman, Sparks, Stewart, and Thompson exacerbated the Officer Defendants' motivations when they solicited the approval of more shares granted under an equity incentive plan.  On April 28, 2022, Medical Properties filed its 2022 Proxy with the SEC.  Defendants Aldag, Dawson, Hamner, Mozingo, Murphy, Pitman, Sparks, Stewart, and Thompson solicited the 2022 Proxy.  The 2022 Proxy called for Company shareholders to approve the Medical Properties Trust, Inc. Amended and Restated 2019 Equity Incentive Plan, which, among other things, would provide for an additional 16 million shares in connection with eligible awards to be received by the Company's directors and officers.  Accordingly, defendants Aldag, Dawson, Hamner, Mozingo, Murphy, Pitman, Sparks, Stewart, and Thompson sought to further the misaligned motivations between the Officer Defendants and the Company instead of correcting them.

### INSIDER SALES BY DEFENDANTS ALDAG, HAMNER, MCLEAN, HANNA, STEWART, AND DAWSON

103.    Rather than providing the market with correct information, the Insider Selling Defendants used their knowledge of Medical Properties' material, nonpublic information to sell their personal holdings while the Company's stock was artificially inflated.  As officers and directors of Medical Properties, the Insider Selling Defendants were privy to material, nonpublic information about the Company's true business health.

104.    While in possession of this knowledge, defendant Aldag sold 1,827,939 shares of his personally held Medical Properties stock for proceeds of $37.6 million.  Defendant Aldag's sales were timed to maximize profit from Medical Properties' then artificially inflated stock price.  Notably, defendant Aldag's sales are suspicious because none of them were made pursuant to trading plans.  Defendant Aldag's sales are also suspicious given that his stock sales represented 25.67% of his holdings as demonstrated by the table below:

| | |
|---|---|
| Total Shares Before Sales | 2,160,784 |
| Shares Sold During the Sales Period ("SP") | 1,827,939 |
| Shares Disposed (Other) During SP | 1,067,731 |
| Total Shares Held During SP | 7,122,070 |
| Shares Remaining SP | 4,226,400 |
| **Total Proceeds from Sales** | **$37,610,483.90** |
| **% of Total Ownership Sold During SP** | **25.67%** |

105.    While in possession of this knowledge, defendant Hamner sold 902,500 shares of his personally held Medical Properties stock for proceeds of $18.5 million.  Defendant Hamner's sales were timed to maximize profit from Medical Properties' then artificially inflated stock price.  Notably, defendant Hamner's sales are suspicious because none of them were made pursuant to trading plans.  Defendant Hamner's sales are also suspicious given that his stock sales represented 23.35% of his holdings as demonstrated by the table below:

| | |
|---|---|
| Total Shares Before Sales | 1,382,957 |
| Shares Sold During SP | 902,500 |
| Shares Disposed (Other) During SP | 609,444 |
| Total Shares Held During SP | 3,864,797 |
| Shares Remaining SP | 2,352,853 |
| **Total Proceeds from Sales** | **$18,575,025.00** |
| **% of Total Ownership Sold During SP** | **23.35%** |

106.    While in possession of this knowledge, defendant McLean sold 400,000 shares of his Medical Properties stock for proceeds of $7.7 million.  Defendant McLean's sales were timed to maximize profit for Medical Properties' then artificially inflated stock price.  Notably, defendant McLean's sales are suspicious because none of them were made pursuant to trading plans.  Defendant McLean's sales are also suspicious given that his stock sales represented 14.23% of his holdings as demonstrated by the table below:

| | |
|---|---|
| Total Shares Before Sales | 1,166,337 |
| Shares Sold During SP | 400,000 |
| Shares Disposed (Other) During SP | 355,027 |
| Total Shares Held During SP | 2,811,674 |
| Shares Remaining SP | 2,056,647 |
| **Total Proceeds from Sales** | **$7,719,000.00** |
| **% of Total Ownership Sold During SP** | **14.23%** |

107.    While in possession of this knowledge, defendant Hanna sold 50,500 shares of his personally held Medical Properties stock for proceeds of $1 million.  Defendant Hanna's sales were timed to maximize profit for Medical Properties' then artificially inflated stock price.  Notably, defendant Hanna's sales are suspicious because none of them were made pursuant to trading plans. Defendant Hanna's sales are also suspicious given that his stock sales represented 27.74% of his holdings as demonstrated by the table below:

| Total Shares Before Sales | 76,318 |
|---|---|
| Shares Sold During SP | 50,500 |
| Shares Disposed (Other) During SP | 22,176 |
| Total Shares Held During SP | 182,070 |
| Shares Remaining SP | 109,394 |
| **Total Proceeds from Sales** | **$1,053,910.00** |
| **% of Total Ownership Sold During SP** | **27.74%** |

108.    While in possession of this knowledge, defendant Stewart sold 26,900 shares of his personally held stock for proceeds of $538,811.  Defendant Stewart's sales were timed to maximize profit from Medical Properties' then artificially inflated stock price.  Notably, defendant Stewart's sales are suspicious because none of them were made pursuant to trading plans.   Defendant Stewart's sales are also suspicious given that his stock sales represented 10.88% of his holdings as demonstrated by the table below:

| Total Shares Before Sales | 224,615 |
|---|---|
| Shares Sold During SP | 26,900 |
| Shares Disposed (Other) During SP | 0 |
| Total Shares Held During SP | 247,336 |
| Shares Remaining SP | 220,436 |
| **Total Proceeds from Sales** | **$538,811.00** |
| **% of Total Ownership Sold During SP** | **10.88%** |

109.    While in possession of this knowledge, defendant Dawson sold 7,476 shares of his personally held Medical Properties stock for proceeds of $135,091.  Defendant Dawson's sales were timed to maximize profit from Medical Properties' then artificially inflated stock price.

Notably, defendant Dawson's sales are suspicious because none of them were made pursuant to trading plans.

110.    The Insider Selling Defendants' sales were timed to maximize profit from the Individual Defendants overall scheme to artificially inflate Medical Properties' stock price.   In sum, the Insider Selling Defendants sold over $65.6 million worth of stock at artificially inflated prices as detailed by the table below:

| Insider Last Name | Transaction Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| **ALDAG**<br>**Current Chairman, President and CEO** | 10/10/2019 | 101,964 | $19.78 | $2,016,847.92 |
| | 7/7/2020 | 156,569 | $18.60 | $2,912,183.40 |
| | 7/8/2020 | 244,406 | $18.43 | $4,504,402.58 |
| | 3/30/2021 | 710,000 | $21.21 | $15,059,100.00 |
| | 3/30/2022 | 615,000 | $21.33 | $13,117,950.00 |
| | Total: | 1,827,939 | | $37,610,483.90 |
| | | | | |
| **HAMNER**<br>**Current Executive Vice President, CFO, and Director** | 8/7/2019 | 70,000 | $17.77 | $1,243,900.00 |
| | 9/25/2019 | 77,500 | $19.43 | $1,505,825.00 |
| | 7/2/2020 | 220,000 | $19.12 | $4,206,400.00 |
| | 2/24/2021 | 250,000 | $22.49 | $5,622,500.00 |
| | 4/7/2022 | 285,000 | $21.04 | $5,996,400.00 |
| | Total: | 902,500 | | $18,575,025.00 |
| | | | | |
| **MCLEAN**<br>**Current Executive Vice President and COO** | 8/19/2019 | 100,000 | $18.37 | $1,837,000.00 |
| | 1/8/2020 | 100,000 | $20.84 | $2,084,000.00 |
| | 7/6/2020 | 200,000 | $18.99 | $3,798,000.00 |
| | Total: | 400,000 | | $7,719,000.00 |
| | | | | |
| **HANNA**<br>**Current Senior Vice President, Controller, and Chief Accounting Officer** | 8/4/2020 | 17,500 | $20.02 | $350,350.00 |
| | 3/17/2021 | 33,000 | $21.32 | $703,560.00 |
| | Total: | 50,500 | | $1,053,910.00 |
| | | | | |
| **STEWART**<br>**Current Director** | 12/4/2019 | 4,800 | $21.08 | $101,184.00 |
| | 7/1/2020 | 5,000 | $19.09 | $95,450.00 |
| | 11/4/2020 | 6,300 | $19.11 | $120,393.00 |
| | 8/2/2021 | 4,800 | $20.88 | $100,224.00 |
| | 3/10/2022 | 6,000 | $20.26 | $121,560.00 |
| | Total: | 26,900 | | $538,811.00 |
| | | | | |
| **DAWSON** | 8/8/2019 | 7,476 | $18.07 | $135,091.32 |

| Current Director | | | | |
|---|---|---|---|---|
| | Total: | 7,476 | | $135,091.32 |
| | | | | |
| | | | | |
| | Total: | 3,215,315 | | $65,632,321.22 |

## DAMAGES TO MEDICAL PROPERTIES

111.    As a result of the Individual Defendants' improprieties, the Company disseminated improper, public statements concerning its operational capabilities and related business risks. These improper statements have devastated Medical Properties' credibility as reflected by the Company's almost $10.4 billion, or approximately 85.3%, market capitalization loss.

112.    Medical Properties' performance issues also damaged its reputation within the business community and in the capital markets.  Medical Properties' current and potential investors consider a company's ability to accurately disclose the health of its business and its operational risks, as well as disclose the ability of tenants to pay rent.  Medical Properties' ability to raise equity capital or debt on favorable terms in the future is now impaired.  In addition, the Company stands to incur higher marginal costs of capital and debt because the improper statements and misleading projections disseminated by the Individual Defendants have materially increased the perceived risks of investing in and lending money to the Company.

113.    Further, as a direct result of the Individual Defendants' improprieties, Medical Properties has expended, and will continue to expend, significant sums of money.   Such expenditures include, but are not limited to:

(a)     costs incurred from defending and paying any settlement in the Securities Class Action for violations of federal securities laws;

(b)     costs incurred from recovering uncollected rent and outstanding loans;

(c)     costs incurred by Medical Properties in restating its previous financial statements;

(d)     costs incurred from remedying its image with investors through increased advertising and promotional benefits; and

(e)     costs incurred from compensation and benefits wrongly paid to the Individual Defendants who have breached their duties to Medical Properties.

### THE BOARD BREACHES ITS DUTY BY FAILING TO RESPOND TO THE DEMAND IN GOOD FAITH

114.    Plaintiff brings this action derivatively in the right and for the benefit of Medical Properties to redress injuries suffered, and to be suffered, by Medical Properties as a direct result of breaches of fiduciary duty, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.  Medical Properties is named as a nominal defendant solely in a derivative capacity.

115.    Plaintiff will adequately and fairly represent the interests of Medical Properties in enforcing and prosecuting its rights.  Plaintiff was a shareholder of Medical Properties at the time of the wrongdoing complained of, has continuously been a shareholder since that time, and is a current Medical Properties shareholder.   As discussed below, plaintiff's Demand has been wrongfully refused by the Board.  Accordingly, plaintiff was forced to file this action on behalf of the Company.

116.    On June 8, 2023, plaintiff sent Medical Properties the Demand detailing the wrongdoing explained herein and demanding that the Board investigate and initiate litigation against the culpable fiduciaries.  A true and correct copy of the Demand is attached hereto as Exhibit 1.  Plaintiff demanded the Board investigate the circumstances surrounding Medical Properties' false and misleading statements and violations of any applicable laws, rules, and

regulations, including insider trading.  In addition, plaintiff demanded that the Board investigate any other violations of applicable laws, rules, and regulations.  Plaintiff further demanded that, following the investigation, the Company commence legal proceedings against each party identified as being responsible for the mismanagement and other related misconduct described above.  The legal proceedings included claims for breaches of fiduciary duty, insider trading, and indemnification and contribution, among other relevant and appropriate claims.  The legal proceedings include recovery of the salaries, bonuses, director remuneration, and other compensation paid to the parties responsible because these parties were unjustly enriched by such compensation.  Plaintiff urged the Board to commence these legal proceedings as expeditiously as possible and secure tolling agreements.

117.    On July 19, 2023, over a month after the Demand was sent, the Board responded to plaintiff's Demand in a one-paragraph letter.  The response stated, in part, that the Board "will consider [the Demand] in appropriate due course."

118.    On November 10, 2023, plaintiff followed up with the Board and reminded the Board that it has been "over five months" since the Demand was sent.

119.    On November 13, 2023, the Board sent a letter to plaintiff stating that the Board would "defer consideration of the demand."  The Board's decision to defer consideration took over five months.  The Board did not provide a definite time that it would even begin its investigation.

120.    It has been over a year since plaintiff sent the Demand to the Board.  In that time, the Board has refused to: (i) make a decision regarding the Demand; (ii) secure tolling agreements with officers and directors of the Company; (iii) investigate claims in the Demand; and (iv) give plaintiff a reasonable non-ambiguous timetable for when it will make a decision regarding the Demand.  It appears the Director Defendants refused to investigate the wrongdoing in order to hide

any wrongful conduct they have committed.  Accordingly, the Company remains exposed to additional harm from the wrongful conduct described herein and is not protected against the running of the statute of limitations.

**COUNT I**

**Against the Individual Defendants for Breach of Fiduciary Duty**

121.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

122.    The Individual Defendants owed and owe Medical Properties fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe Medical Properties the highest obligation of loyalty and care.

123.    The Individual Defendants and each of them, violated and breached their fiduciary duties.

124.    The Officer Defendants either knew, were reckless, or were grossly negligent in disregarding the illegal activity of such substantial magnitude and duration.  The Officer Defendants either knew, were reckless, or were grossly negligent in not knowing that: (i) the Company's tenants were financially distressed; and (ii) the Individual Defendants made materially false and misleading statements to conceal the financially distressed state of Medical Properties' tenants.  Accordingly, the Officer Defendants breached their duty of care and loyalty to the Company.

125.    The Director Defendants, as directors of the Company, owed Medical Properties the highest duty of loyalty.  The Director Defendants knew or were reckless in not knowing that: (i) the Company's tenants were financially distressed; and (ii) the Individual Defendants made materially false and misleading statements to conceal the financially distressed state of Medical

Properties' tenants.  Additionally, the Director Defendants have breached their fiduciary duties by wrongfully refusing the Demand.  Accordingly, these defendants breached their duty of loyalty to the Company.

126.    The Audit Committee Defendants breached their fiduciary duty of loyalty by approving the statements described herein which were made during their tenure on the Audit Committee, which they knew or were reckless in not knowing contained improper statements and omissions.  The Audit Committee Defendants completely and utterly failed in their duty of oversight, and failed in their duty to appropriately review financial results, as required by the Audit Committee Charter in effect at the time.

127.    The Risk Committee Defendants breached their fiduciary duty of loyalty by approving the statements described herein which were made during their tenure on the Risk Committee, which they knew or were reckless in not knowing contained improper statements and omission.  The Risk Committee Defendants completely and utterly failed in their duty of oversight, and failed to mitigate risks when they allowed the Individual Defendants to conceal the financially distressed tenants with materially false and misleading statements.

128.    The Insider Selling Defendants breached their duty of loyalty by selling Medical Properties stock on the basis of the knowledge of the improper information described above before that information was revealed to the Company's shareholders.  The information described above was material, nonpublic information concerning the Company's future business prospects.  It was a proprietary asset belonging to the Company, which the Insider Selling Defendants used for their own benefit when they sold Medical Properties common stock.

129.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Medical Properties has sustained significant damages, as alleged herein.  As

a result of the misconduct alleged herein, these defendants are liable to the Company.

130.    Plaintiff, on behalf of Medical Properties, has no adequate remedy at law.

## COUNT II

### Against the Individual Defendants for Unjust Enrichment

131.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

132.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Medical Properties.  The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to Medical Properties.

133.    The Insider Selling Defendants sold Medical Properties stock, motivated at least in part, by their possession of material, nonpublic information that artificially inflated the price of Medical Properties stock.   As a result, the Insider Selling Defendants profited from their misconduct and were unjustly enriched through their exploitation of material and adverse inside information.

134.    Plaintiff, as a shareholder and representative of Medical Properties, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

135.    Plaintiff, on behalf of Medical Properties, has no adequate remedy at law.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of Medical Properties, demands judgment as follows:

A.      Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breaches of fiduciary duties and unjust enrichment;

B.      Directing Medical Properties to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Medical Properties and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote, resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote of the following corporate governance policies:

1.      a proposal to strengthen the Company's controls over leasing properties to financially distressed tenants;

2.      a proposal to strengthen the Company's controls over financial reporting;

3.      a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

4.      a provision to permit the shareholders of Medical Properties to nominate at least three candidates for election to the Board;

5.      a proposal to revise the Company's equity incentive plans to exclude NFFO;

6.      a provision to control insider selling;

7.      a proposal to strengthen Medical Properties' oversight of its disclosure procedures; and

8.      a proposal to make the Company's Risk Committee Charter available on the Company's website.

C.      Extraordinary equitable and injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of Medical Properties has an effective remedy;

D.      Awarding to Medical Properties restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants, including all ill-gotten gains from insider selling by the Insider Selling Defendants;

E.      Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated:  July 26, 2024                    **BROWN GOLDSTEIN LEVY LLP**


_    /s/ Dana Whitehead McKee    _
Dana Whitehead McKee, Federal Bar No. 04447
Michael R. Abrams, Federal Bar No. 30426
120 E. Baltimore Street, Suite 2500
Baltimore, MD 21202
Telephone: (410) 962-1030
Facsimile: (410) 385-0869
dwm@browngold.com
mabrams@browngold.com

**ROBBINS LLP**
Brian J. Robbins (*pro hac vice to be filed*)
Craig W. Smith (*pro hac vice to be filed*)
Shane P. Sanders (*pro hac vice to be filed*)
5060 Shoreham Place, Suite 300
San Diego, CA 92122
Telephone: (619) 525-3990
Facsimile: (619) 525-3991

brobbins@robbinsllp.com
csmith@robbinsllp.com
ssanders@robbinsllp.com

*Counsel for Plaintiff*

## **VERIFICATION**

I, Joseph Crognale, hereby declare as follows:

I am the plaintiff in this action.  I have read the verified shareholder derivative complaint. Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated: 7/15/2024 _____

DocuSigned by:

*Joseph Crognale*

6945ZAE7D25B4F9

JOSEPH CROGNALE